UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                    :        Chapter 11
                                          :
G.S. DISTRIBUTION, INC.,                  :        Case No. 05-14576 (ALG)
                                          :
                                          :
                            Debtor.       :
                                          :
------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

LEWIS W. SIEGEL, ESQ.
Counsel for the Debtor
444 Madison Avenue – 27th Floor
New York, New York 10022

BERG AND DUFFY, LLP
Counsel for Repossi Diffusion S.A.M.
  By:   James P. Duffy, III, Esq.
        John Bekian, Esq.
3000 Marcus Avenue, Suite 1 West 2
Lake Success, New York 11042

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

         Before the Court are two motions: (i) one filed by G.S. Distribution, Inc. (the

"Debtor") to authorize private sales of certain jewelry in its possession, and (ii) one filed

by Repossi Diffusion S.A.M. ("Repossi"), the manufacturer and supplier of the jewelry,

to dismiss this Chapter 11 proceeding or, in the alternative, obtain relief from the

automatic stay to continue certain litigation in the United States District Court for the

Southern District of New York (the "District Court").  For the reasons set forth below,

the Court denies the Debtor's motion for authority to conduct private sales of the jewelry,

grants Repossi's motion for relief from the automatic stay, and denies Repossi's motion
to dismiss.

Based on extensive motion papers filed with the Court and an evidentiary hearing
held on September 13, 2005, the Court makes the following findings of fact and
conclusions of law.

### Facts

The Debtor is a New York corporation that leased and operated a retail jewelry
store on Madison Avenue from August 6, 2003 until the spring of 2005.  The Debtor is
owned indirectly by Giuseppe Scavetta, who formed it for the purpose of marketing high-
quality jewelry in the United States.  Scavetta had no prior experience in the jewelry
field, having had business interests in Europe in construction and in the operation of a
language school.

The Debtor began its business for an Italian jeweler named Ciribelli, conducting
business under the Ciribelli name and selling Ciribelli jewelry at its store on Madison
Avenue for approximately six months.  However, despite substantial capital infusions
from Scavetta, the Debtor was only able to sell about $20,000 worth of Ciribelli jewelry
during this time.  Ciribelli apparently ended its relationship with the Debtor and
reclaimed its jewelry by September, 2004.

After its short, unsuccessful experience with Ciribelli, the Debtor entered into an
exclusive distribution contract, dated September 9, 2004 (the "Contract"), with Repossi, a
designer and manufacturer of high-end jewelry formed as a limited liability company
under the laws of the Principality of Monaco.  Pursuant to the Contract, the Debtor would
import, distribute and sell in the United States jewelry manufactured by Repossi under

the Repossi trademark and as a Repossi boutique.  Although the Contract is in English, it

apparently was drafted in Europe by representatives of Scavetta and of Repossi's

principal, a well-known jewelry designer, Alberto Repossi.  The Contract provides

generally for sales of jewelry by Repossi to the Debtor and sets forth terms of price and

various obligations.  Schedule 4 to the Contract also spells out the terms of a different

relationship pursuant to which, by mutual agreement, Repossi would provide jewelry to

the Debtor on a consignment basis subject to certain specific terms and conditions.

Schedule 4 provides in pertinent part, in somewhat broken English:

> Upon mutual agreement collection, Repossi Diffusion shall make
> available Repossi Jewelry to [G.S. Distribution] on a consignment basis
> subject to the terms and conditions of this Article.  Such consignment of
> Repossi Jewelry is expected to be made for sales promotion to important
> customers, private visits, exhibitions, and show cases.

At the hearing, Scavetta testified that Repossi provided the jewelry now in the Debtor's

possession -- and the subject of the present motions -- pursuant to Schedule 4 to the

Contract.

The Contract also authorized the Debtor to use the Repossi trademark in

promoting and selling the jewelry, requiring the Debtor to adhere to certain marketing

guidelines, including refitting the Debtor's boutique under the Repossi name.  The parties

do not dispute that the Debtor's boutique on Madison Avenue was devoted entirely to the

sale of Repossi jewelry.

Pursuant to the Contract, Repossi provided to the Debtor jewelry that is currently

in the Debtor's possession and that has a wholesale value of over $5 million.  This

jewelry was imported into the United States under a special customs arrangement called

Temporary Importation under Bond ("TIB") whereby, under certain conditions, goods

can be imported into the United States for a limited period of time without payment of
duty.  Under a TIB arrangement, the importer must post a bond to guarantee that the
goods will be exported or destroyed within a specified time period, on pain of liquidated
damages payable to the Customs Service in the amount of the bond.  According to the
testimony of a lawyer who specializes in customs issues, goods imported under a TIB are
generally restricted to samples, such as samples for testing or inspection or samples to be
displayed at a sales show, and goods imported under a TIB cannot be sold in the United
States after entry.[1]

The record is not altogether clear regarding the amount of Repossi jewelry sold
between September 9, 2004, when the Contract went into effect, and April 18, 2005,
when Repossi obtained a preliminary injunction from the District Court, as further
described below, prohibiting further sale of the jewelry.[2]  Scavetta testified without
documentary support that the Debtor sold a total of $500,000 worth of Repossi jewelry:
approximately $300,000 worth at the boutique on Madison Avenue ($200,000 from
September, 2004 through mid-March, 2005, and $100,000 from mid-March, 2005 to the
grant of the injunction in April, 2005) and approximately $200,000 through Saks Fifth
Avenue, Inc. ("Saks").  With regard to the sale process, Scavetta testified that the Debtor

---

[1] The customs bonds state on their face that the covered goods were "not imported for sale or sale upon
approval" and would be "exported within the 1 year bond period or destroyed under customs supervision."
Although the bonds also state, in somewhat contradictory fashion, that the Debtor, as importer, was "owner
or purchaser" of the merchandise and that the "merchandise was obtained pursuant to a purchase or
agreement to purchase," there is no dispute on the record that the goods could not lawfully be sold in the
United States without first being exported and then re-imported under another customs arrangement.  Some
of the customs bonds have apparently been extended beyond the initial one-year term, but they are still in
effect.
[2] The record is also silent as to whether this jewelry was consigned and the basis on which this jewelry was
imported into the United States.  It is clear that the Debtor had possession of substantial amounts of Repossi
jewelry in addition to the $5 million of consigned jewelry still in its custody.

would inform Repossi when a piece of jewelry was sold, after which Repossi would issue an invoice to the Debtor for the wholesale purchase price.

It is undisputed that the Debtor never paid Repossi for any of the invoiced jewelry. In an effort to recover the jewelry, or the value thereof, Repossi filed an action against the Debtor in the District Court on March 15, 2005, claiming (i) breach of contract, (ii) conversion and (iii) trademark infringement. In response, the Debtor counterclaimed for damages for Repossi's alleged breach of the Contract by selling its jewelry directly to customers in the United States, its alleged improper appropriation of publicity that the Debtor had paid for, and its alleged violation of New York State franchise law. In support of its counterclaim based on breach of the franchise laws, the Debtor took the position in the District Court that the Contract was illegal and unenforceable.

Repossi moved for a preliminary injunction to prohibit the Debtor from continuing to sell Repossi jewelry or use the Repossi trademark. After two hearings, District Judge Chin granted Repossi's motion, finding that even under the Debtor's theory of the case, the Contract was "void and unenforceable." Hrg. Transcr. p. 22, l. 24-25 (April 18, 2005). Under the terms of the injunction, the Debtor was enjoined from (i) holding itself out as a Repossi store, (ii) using the Repossi trademark in connection with any goods and services, (iii) selling or lending jewelry received from Repossi, and (iv) moving such jewelry or its proceeds out of the State of New York. Judge Chin also ordered the Debtor to close its store located on Madison Avenue as a Repossi store and to permit a Repossi representative to conduct an inventory of the jewelry and retrieve any Repossi jewelry the Debtor had loaned to third parties.

On the basis of the Debtor's alleged failure to comply with the order of the District Court, Repossi requested permission from Judge Chin to move for summary judgment and for contempt sanctions. On June 10, 2005, Judge Chin gave Repossi permission to file its motion.

Eleven days later, on June 21, 2005, the Debtor filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code. The Debtor's schedules show Repossi as the primary creditor with a claim of approximately $5,000,000. The only other substantial creditor currently is Scavetta, who asserts a claim of $1,452,000. The remainder of the debt is minimal, amounting to approximately $25,000. At the time of the filing, the Debtor also had a substantial dispute with its landlord, but after filing its petition, the Debtor promptly took steps to negotiate with the landlord and entered into a stipulation providing that the Debtor would vacate and surrender the store on Madison Avenue and that the landlord would apply the Debtor's pre-petition security deposit and waive any further claim. The Debtor subsequently wrote to Judge Chin on two separate occasions requesting that he lift or modify the preliminary injunction to permit it to sell the jewelry or store it out of state. Judge Chin denied both requests. Thereafter, under the supervision of this Court, the jewelry was placed in a vault in New York, where it is currently located.

## Discussion

### I.  Debtor's Motion to Approve Private Sales of the Jewelry

The first motion, and the one most easily dealt with, is the Debtor's motion to authorize private sales of the jewelry. Under the Debtor's proposed method of sale, a series of private sales would be arranged at which a sales representative, aware of a

client's interest in Repossi jewelry and having some social connection with the client, would invite the client to a private showing of the jewelry. The sales representative would receive a commission of 10% of the selling price for any jewelry sold. According to Scavetta, each private showing would result in the sale of approximately $200,000 (wholesale) of jewelry, and the total proceeds from the private sales would allow the Debtor to pay all creditors of the estate in full. The Debtor's motion to authorize such sales is brought under § 363 of the Bankruptcy Code.

### A. Section 363(c)(1) of the Bankruptcy Code

The Debtor first asserts that its proposed private sales program falls within the scope of § 363(c)(1) of the Bankruptcy Code, which allows a debtor in possession to sell property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c)(1). In response, Repossi argues that the proposed private sales of the jewelry are outside the ordinary course of business because (i) a hypothetical creditor with a lien would not expect over $5 million of jewelry to be sold in private showings and (ii) no high-end jeweler would attempt to sell more than 1,000 pieces of jewelry in private showings. Repossi bases its argument on a two-part test applied by courts to determine whether a transaction is in the ordinary course of business: (1) the creditor's expectation test, or vertical test, and (2) the industry-wide test, or horizontal test.

> In connection with the vertical test, the court "views the disputed transaction from the vantage point of a hypothetical lien creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to enter into a contract with the debtor." The horizontal test involves "an industry-wide perspective in which the debtor's business is compared to other like businesses. In this comparison, the test is whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business."

*Albany Port Dist. Comm'n v. Cibro Petroleum Prods. (In re Winimo Realty Corp.)*, 2004

U.S. Dist. LEXIS 17260, at *14 (S.D.N.Y. Aug. 27, 2004), citing and quoting *Medical*

*Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 385 (2d Cir. 1997); see

also *In re Enron Corp.*, 2003 Bankr. LEXIS 2111 (Bankr. S.D.N.Y. Mar. 21, 2003).

Putting aside the question whether the jewelry can legally be sold in the United

States, the Debtor has introduced no evidence to indicate that private sales of more than

1,000 pieces of jewelry with a wholesale value of over $5 million would meet either the

vertical or horizontal tests as ordinary course of business transactions. The Debtor has

limited experience in the jewelry industry and absolutely no experience with private

sales. As described below, the Debtor has also failed to develop an adequate business

plan describing and analyzing its proposed private sales program. Under these

circumstances, the Court finds that a hypothetical lien creditor would not accept the

economic risks associated with private sales. Furthermore, based on the record, it

appears that private sales in the industry of high-end jewelry are at best ancillary to the

sales that occur through more established channels of distribution, and no evidence was

introduced that a seller of high-end jewelry would attempt to sell a large volume of

jewelry solely through private sales. In short, the Debtor's proposed private sales are not

authorized under § 361(c) as ordinary course of business transactions.

### B. Section 363(b)(1) of the Bankruptcy Code

The Debtor argues in the alternative that the Court should authorize the private

sales pursuant to § 363(b)(1) of the Bankruptcy Code, which permits a court to authorize

a debtor in possession, after notice and a hearing, to use, sell or lease property of the

estate outside of the ordinary course of business. 11 U.S.C. § 363(b)(1). In determining

whether to approve a proposed sale under this section, courts require that the sale be based upon the sound business judgment of the debtor.  See *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); see also *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir 1992); *In re Enron Corp.*, 284 B.R. 376, 392 n.15 (Bankr. S.D.N.Y. 2002).

In an effort to demonstrate sound business judgment, the Debtor introduced into evidence at the hearing a few hastily-drafted pages of numbers purporting to be a business plan but containing no substantive analysis of business justifications, risks, costs, or anticipated benefits of the proposed private sales.  These materials had no more probative value than Scavetta's vague testimony as to business advice received on the sales from a "public relations" advisor.  Scavetta also made it clear that the private sales depended on the availability of agents who have a "book" of names of potential clients, but no evidence exists demonstrating that Scavetta has access to any book of customers or that he knows someone with such a book.  Indeed, Scavetta testified that he had not received any written materials from his public relations advisor and only spoke of securing potential clientele in the most general terms.

Furthermore, the Debtor has failed to show how selling the jewelry pursuant to private sales is in the best interests of the estate, particularly where it is opposed by the estate's largest creditor.  See *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 982-83 (Bankr. N.D.N.Y. 1988) (disposition of estate assets under § 363(b) must be in the best interests of the estate and its creditors); see also *In re Angelika Films 57th*, 1997 U.S.

Dist. LEXIS 7463, at *17 (S.D.N.Y. May 27, 1997). The Debtor's duty to act in the best interests of the estate is a duty owed to its creditor body as a whole. The fact that Repossi, the manufacturer of the jewelry and largest creditor of the estate, objects to the Debtor's proposed private sales program is an important factor in determining whether the program is in the best interests of the estate. In light of Repossi's objection to the private sales program, coupled with the Debtor's lack of an adequate business plan for such program, the Court finds that Debtor has failed to demonstrate sound business judgment and cannot show that the program is in the best interests of the estate.

Moreover, the Court could not authorize private sales of the jewelry given the following additional problems, each of which would justify denial of the motion. First, the Debtor cannot sell the jewelry in the United States given the TIB. It might be possible for the Debtor to export and then re-import the jewelry under a different customs arrangement, but the Debtor did not prove the feasibility of this option. Furthermore, Judge Chin has entered an injunction that remains in effect and prohibits the sale of the jewelry. The Debtor claims that it will seek to have the injunction lifted in the event this Court grants its motion to authorize the sales, but the District Court has already denied such relief twice.

The issue of the District Court's grant of relief from the injunction leads directly to the second of the motions before the Court, Repossi's request to lift the automatic stay and permit the litigation in the District Court to continue on the grounds that the District Court is the most appropriate forum to determine relief from the injunction and liquidation of the Debtor's claims and counterclaims with Repossi. Before reaching that determination, however, it is appropriate to consider the central bankruptcy-related issue

raised by the Debtor -- namely, does this Debtor have property rights in the jewelry that are entitled to protection, even if its private sales program is denied?

## II.  The Debtor's Rights in the Jewelry

As stated above, Scavetta testified that the Repossi jewelry now in its possession was provided to the Debtor under a consignment arrangement pursuant to Schedule 4 to the Contract.  The Debtor claims that this arrangement provided it, on the bankruptcy filing, with certain rights in the jewelry, and that as a debtor in possession it takes these rights for the benefit of the Debtor's creditors, including Scavetta, whether or not Repossi consents.  As discussed below, the Debtor's rights as a debtor in possession do not appear, on the record to date, to overcome Repossi's rights as owner of the jewelry.

### A.  Uniform Commercial Code

Property acquired under a consignment arrangement, even if not paid for, may be subject to claims of the consignee's creditors, and a debtor in possession may be entitled to exercise these rights under the Uniform Commercial Code ("U.C.C.") for the benefit of the estate and its other creditors.  See *In re Morgansen's Ltd.*, 302 B.R. 784 (Bankr. E.D.N.Y. 2003); *In re Valley Media, Inc.*, 279 B.R. 105 (Bankr. D. Del. 2002).  Article 9 of the U.C.C. applies to a "consignment," U.C.C. § 9-109(a)(4), and in determining the Debtor's rights to the jewelry, the starting point of the analysis is § 9-102(a)(20) of the U.C.C. as adopted in New York.  Section 9-102(a)(20) defines "consignment" as:

> a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
> (A) the merchant:
> > (i) deals in goods of that kind under a name other than the name of the person making delivery;
> > (ii) is not an auctioneer; and
> > (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;

> (B) with respect to each delivery, the aggregate value of the goods is $1,000 or
> more at the time of delivery;
> (C) the goods are not consumer goods immediately before delivery; and
> (D) the transaction does not create a security interest that secures an obligation.

If a transaction is a consignment under § 9-102(a)(20), the consignor must ordinarily file

a financing statement in order to protect its interest in the property from the claims of a

bankruptcy trustee or debtor in possession acting on behalf of the estate's creditors under

the "strong arm powers" of § 544 of the Bankruptcy Code. See *Morgansen's*, 279 B.R. at

787. A transaction must satisfy each element of the definition to be considered a

consignment under § 9-102(a)(20), and the burden of proof falls on the party claiming

applicability of the section. *Id.* The Debtor has the burden of proof because it asserts

that the transfer of jewelry was a consignment under § 9-102(a)(20).

Repossi asserts that the consignment provided in the Contract is not subject to the

U.C.C. because, referring to subsection (A)(i), the Debtor was not a merchant dealing in

goods delivered to it for the purpose of sale "under a name other than the name of the

person making delivery." This subsection is designed to carry out one of the purposes of

making consignments subject to Article 9, which is to ensure that a consignee's general

creditors are put on notice of the consignor's interest in the consigned property, and "to

protect general creditors of the consignee from claims of consignors that have

undisclosed consignment arrangements with the consignee that create secret liens on the

inventory." *Valley Media*, 279 B.R. at 121. Where a consignee operates only under the

name of the consignor, the U.C.C. assumes that the consignee's general creditors will be

on notice of the consignment and will not be misled into believing that the merchant has

ownership of the inventory in its possession. *Id.* at 123.

12

It is undisputed that during the term of the Contract the Debtor held itself out to be a merchant only of Repossi jewelry. Since the Debtor dealt only in Repossi goods and did not sell any other jewelry, it did not deal in goods under "a name other than the name of the person making delivery." The arrangement accordingly would not be a consignment for purposes of application of Article 9.

The Debtor argues nevertheless that the goods were provided by "Repossi Diffusion S.A.M.," a corporate seller with a name distinct from "Repossi" or "Repossi Joallier," as used by the Debtor in operating its business. However, the Debtor's argument exalts form over substance and ignores the purpose of the statute, which is to protect creditors from being "misled by the apparent ownership of goods held by a consignee." *Newhall v. Haines*, 10 B.R. 1019, 1022 (D. Mon. 1981) (discussing statutory predecessor to U.C.C. § 9-102(a)(20)).

The Debtor argues that the provisions of the statute relevant to the use of a name have been construed strictly, citing *In re Wicaco Machine Corp.*, 49 B.R. 340 (E.D. Pa. 1984), and *Mann v. Clark Oil & Refining Corp.*, 302 F. Supp. 1376 (E.D. Mo. 1969). These cases, which dealt with the predecessor to § 9-102(a)(20), held that a consignor could avoid application of the statute only where its business was "completely enveloped" in or was "completely identified" with the business of the consignee, and that the statute would apply where the consignee sold goods of suppliers other than the consignor, or where it made known its separate identity. *Wicaco*, 49 B.R. at 343; *Mann*, 302 F. Supp. at 1380.[3] The relationship between the Debtor and Repossi comes within

---

[3] *Wicaco* involved a consignee that sold consigned goods under the consignor's name and unconsigned goods under its own name. In considering the applicability of the statute, the Court found that the consignee was not operating under the name of the consignor because the consignee's business was not

the framework of complete envelopment or identification.  The Debtor held itself out to the public as a Repossi store and has not provided evidence of any outward indication to suggest that it was an entity separate from Repossi or that it dealt in goods other than those delivered by Repossi.  Moreover, as Repossi argues, the only substantial creditor who could benefit from a finding that Article 9 applies is Scavetta, and he certainly knew the facts.

Because the consignment arrangement falls outside the definition of consignment in § 9-102(a)(2), the analysis must proceed to § 2-326 of the U.C.C. to determine the respective rights of the Debtor (acting for its general creditors) and Repossi.  See *Morgansen's*, 279 B.R. at 787.  Section 2-326 of the U.C.C., as adopted in New York, provides:

> (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
>> (a) a "sale on approval" if the goods are delivered primarily for use, and
>> (b) a "sale or return" if the goods are delivered primarily for resale.
> (2) Goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.
> (3) Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article (Section 2-201) and as contradicting the sale aspect of the contract within the provisions of this Article on parol or extrinsic evidence (Section 2-202).

Under § 2-326(1), a "sale on approval" is a transfer of goods that remain the property of the seller until the buyer accepts them, and the goods are not subject to the buyer's

---

"completely enveloped" in that of the consignor and creditors could assume that both the consigned goods and the unconsigned goods belonged to the consignee.  *Wicaco*, 49 B.R. at 343.

In *Mann*, the consignee operated a gas station under the name of the consignor.  However, the court found that the consignee was not doing business under the consignor's name within the meaning of the statute because the consignee also displayed a sign above its door, where it identified itself as the dealer.  *Mann*, 302 F. Supp. at 1380.  The Court reasoned that a consignee could do business under the name of the consignor only where the "consignee has completely identified his business with that of the consignor to such an extent that potential creditors would necessarily assume that the business was that of the consignor solely."  *Id*.

general creditors. A "sale or return" is a sale of goods that can be undone at the buyer's option, under which a buyer can assert the rights of its creditors. *Id.* at 789.

In this case the evidence is conflicting as to whether the jewelry consigned to the Debtor was delivered on a "sale on approval" or "sale or return" basis. Schedule 4 to the Contract is entirely unclear on this point. It appears that the Debtor did sell some Repossi jewelry, but whether this was consigned jewelry imported under a TIB remains uncertain. In any event, the key factor, based on the record before this Court, is that any sale of the jewelry presently in the Debtor's possession would violate customs law, as the goods cannot be lawfully sold in the United States under the provisions of the TIB arrangement. The Court will not construe the Contract in a way that would violate the customs laws by finding that the consigned jewelry was imported for sale rather than for a lawful purpose. See *NLRB v. Local 32B-32J SEIU*, 353 F.3d 197, 202 (2d Cir. 2003), quoting *Walsh v. Schlecht*, 492 U.S. 401, 408 (1977) ("contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable"). Indeed, if the Debtor sold the consigned jewelry in this country, it might be liable to forfeit the bonds, creating additional potential liability. It is accordingly assumed that the Debtor intended to act legally, and that it took possession of the goods primarily for use rather than resale and is unable to assert the rights of its creditors based on § 2-326 of the U.C.C.

## B. Termination of the Contract

Repossi also argues that the Debtor has no interest in the jewelry because the Contract was terminated prior to the bankruptcy filing and the Debtor is a mere custodian with no contractual rights. See *Valley Media*, 279 B.R. at 142-43 (holding that a

consignee under a terminated contract had only possessory rights and could not assert the

rights of its creditors over the interests of the consignor/owner).  However, Repossi did

not introduce evidence in the proceedings before this Court that the Contract was

terminated in accordance with its terms.  Under the Contract, a party seeking to terminate

was required to give the other party prior notice of default pursuant to Articles 10 and 11

of the Contract.  For termination for breach of the Contract, Article 10 requires the non-

breaching party to provide (i) an initial notice of the breach and (ii) a second notice of

termination if the breach was not cured within 60 days of receipt of the initial notice.

Article 11 governs the form of notice and provides that:

> Any notice to be given hereunder to either party shall be in writing and in
> English and shall be given by airmail, facsimile or e-mail (provided that
> notices given by facsimile or email shall be confirmed by airmail) and be
> addressed to the respective address first above set forth.

Repossi argues that certain letters demanding payment of attached invoices (all

written in French) sent to the Debtor on November 17, 2004, constituted notice of breach

of the Contract and that a letter of termination dated February 15, 2005, constituted notice

of termination.  However, neither notice complied with the requirements of Article 11.

The letters and invoices faxed on November 17, 2004 are in French rather than English

and did not clearly demand cure of a breach of the Contract.  In any event, the letter dated

February 15, 2005, was sent to the Debtor's general counsel at its address rather than the

Debtor at the address provided for in the Contract.  Thus the November and February

"notices" did not have the effect of validly terminating the Contract.

### C.  Judicial Estoppel

Repossi has a stronger argument that the Debtor should also be judicially

estopped from claiming that the Contract was not terminated because of the position the

Debtor has taken in the District Court. The Debtor argued before Judge Chin that the Contract was void and unenforceable, a position supporting its counterclaim that Repossi had violated the New York franchise laws, and Judge Chin accepted this contention in granting the preliminary injunction. The Debtor now argues that the Contract *is* enforceable and was not properly terminated because this supports its motion for authority to sell the jewelry by private sales and its argument that its rights under the U.C.C. are superior to those of Repossi as consignor. Repossi asserts that the Debtor should be precluded from arguing for the validity of the Contract before this Court under the theory of judicial estoppel, which "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by the party in a prior legal proceeding." *Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, 2001 U.S. Dist. LEXIS 14755, at *33 (S.D.N.Y. Setp. 20, 2001); see also *Young v. United States Dep't of Justice*, 882 F.2d 633, 639 (2d Cir. 1989).

A court has discretion in determining whether a party should be judicially estopped from contradicting a prior position in a later litigation. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). The Supreme Court has identified the following factors to be considered in determining whether a party should be judicially estopped from advocating a particular position in a later judicial proceeding:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled…. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (internal quotation marks and citations omitted).

17

Here, the Debtor has advanced a position in this Court that is inconsistent with the position it advanced in the District Court. Judge Chin noted the position of the Debtor that the Contract was void by finding, for purposes of the preliminary injunction motion, that the Debtor did not have the right to use the Repossi trademark. If this Court were to adopt the Debtor's new position, the Debtor would have the unfair advantage of claiming property rights in the jewelry under the Contract for the purposes of its bankruptcy case while simultaneously seeking damages in the District Court based on its claim that the Contract is void and unenforceable. The three factors enumerated in *New Hampshire* would all be present.

The Debtor argues that the Court should not apply the doctrine of judicial estoppel because, as a debtor in possession, it is a different entity from G.S. Distribution in its prepetition capacity. The Debtor correctly asserts that a bankruptcy trustee, or a debtor in possession asserting the rights of a trustee, has a duty to act on behalf of all creditors, and that bankruptcy trustees in other cases have successfully argued that a court should distinguish between a debtor's status before and after the filing of the petition for purposes of judicial estoppel. See, e.g., *Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Express Corp.)*, 921 F. Supp. 1121, 1124 (S.D.N.Y. 1996). This principle, however, is likely to be of doubtful applicability under the facts of this case. For one thing, the Debtor's reliance on its duty to creditors carries less weight in light of the fact that its primary creditors are Repossi, who claims the Debtor has no right to the jewelry, and Scavetta, an insider who was fully aware of the limitations under the TIB.

More important, the Debtor itself notes that a trustee or debtor in possession will be bound by proceedings in a pre-petition action if "he intervenes and takes on the role of

18

an active litigant subjecting himself thereby to the usual incidents of such action…." *In re XYZ Options, Inc.*, 154 F.3d 1262, 1269 (11th Cir. 1998), citing *Coleman v. Alcock*, 272 F.2d 618, 622 (5th Cir. 1959). Here, the Debtor has been an "active litigant" with regard to the District Court proceedings. It returned to the District Court after filing the petition to seek modification of the preliminary injunction, and it is assumed that the Debtor will continue pursuit of its case against Repossi in the District Court. In any event, this Court need not determine whether the Debtor should be judicially estopped from pursuing any rights it may possess as consignee under the Contract. As discussed below, Repossi's motion to lift the automatic stay should be granted to allow continuation of the litigation commenced in the District Court. The District Court will then be in a position to determine whether under the circumstances the Debtor should be estopped from claiming any rights under the Contract.

## III. Repossi's Motion to Dismiss, or in the Alternative, for Relief from the Automatic Stay

The foregoing brings us to Repossi's motion for an order dismissing the Debtor's case, or in the alternative, lifting the automatic stay to allow the litigation pending in the District Court to go forward. For the reasons discussed below, the Court finds that insufficient grounds exist to dismiss the Debtor's Chapter 11 case. However, there is no reason why the District Court litigation should not go forward.

### A. Motion to Dismiss

Repossi first argues that the Debtor's petition was filed in bad faith and should be dismissed for "cause" under § 1112(b) of the Bankruptcy Code. It is well established that a lack of good faith in filing a Chapter 11 petition constitutes "cause" for dismissal under § 1112(b). See *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113

F.3d 1304, 1309-10 (2d Cir. 1997). A Chapter 11 filing may be dismissed for lack of

good faith "if it is clear that on the filing date there was no reasonable likelihood that the

debtor intended to reorganize and no reasonable probability that it would eventually

emerge from bankruptcy proceedings." *Id.* (quoting *Baker v. Latham Sparrowbush Assoc.*

*(In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)). Repossi

maintains that the Debtor filed for bankruptcy for the improper purpose of using the

automatic stay to suspend contempt sanctions in the District Court and to subvert the

preliminary injunction in order to continue selling the jewelry in violation of Repossi's

trademark.

Despite Repossi's contentions, the Court finds that the Debtor did not file in bad

faith or for an improper purpose. Rather than trying to subvert the preliminary

injunction, the Debtor recognized the applicability of the injunction and has twice sought

modification of the injunction since the time of the filing. At the time of the filing the

Debtor was in arrears of approximately $45,000 based on the termination of its lease and

was indebted to its landlord for over $1 million for the rent due through the end of the

lease. The Debtor needed immediate bankruptcy protection in its dispute with its

landlord and was able to achieve an advantageous settlement with the landlord after the

bankruptcy filing. The Debtor had the right to file a petition in an effort to save its

business and protect any rights its general creditors might have had in the jewelry

pursuant to the "strong arm powers" of § 544 of the Bankruptcy Code. Even though the

filing might have frustrated Repossi's efforts to reclaim the jewelry or the value thereof,

it is also obvious that Repossi failed to take the steps under New York law that would

have given it additional protection, and the Debtor cannot be faulted for asserting the

rights of its creditors to the full extent of the law.  See *Cohoes Indus. Terminal*, 931 F.2d at 228 ("Filing a bankruptcy petition with the intent to frustrate creditors does by itself establish an absence of intent to seek rehabilitation.").

As many decisions have stated, courts should dismiss on bad faith grounds sparingly, "with great caution…."  *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989); see also *In re Johns-Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984); *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997); *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001).  The motion to dismiss the bankruptcy case as filed in bad faith is denied.

### B.  Motion for Relief from the Automatic Stay

Repossi also argues that the Court should lift the automatic stay under § 362(d)(1) of the Bankruptcy Code so that it can pursue the pending litigation in the District Court and liquidate its claims and counterclaims with the Debtor.  Section 362(d)(1) authorizes the Court to lift the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest."

The Second Circuit has identified the following factors to be considered in determining whether to lift the automatic stay to allow litigation to proceed in another tribunal:

(1)    whether relief would result in a partial or complete resolution of the issue;
(2)    lack of any connection with or interference with the bankruptcy case;
(3)    whether the other proceeding involves the debtor as a fiduciary;
(4)    whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
(5)    whether the debtor's insurer has assumed full responsibility for defending it;
(6)    whether the action primarily involves third parties;

(7)    whether litigation in another forum would prejudice the interest of
     the creditors;

(8)    whether the judgment claim arising from the other action is subject
     to equitable subordination;

(9)    whether the movant's success in the other proceeding would result in
     a judicial lien avoidance by the debtor;

(10)   the interests of judicial economy and the expeditious and economical
     resolution of litigation;

(11)   whether the parties are ready for trial in the other proceeding; and

(12)   impact of the stay on the parties and the balance of harms.

*In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). "Not every one of these

factors will be relevant in every case." *Schneiderman v. Bogdanovich (In re*

*Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002), quoting *Mazzeo v. Lenhart (In re*

*Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999).

     The *Sonnax* factors relevant to this case include: (i) whether the relief Repossi

seeks would result in a complete resolution of the issues; (ii) lack of any connection with

or interference with the bankruptcy case; (iii) whether the District Court is a specialized

tribunal with the necessary expertise to hear the relevant claims; (iv) whether litigation in

the District Court would prejudice the interest of other creditors; (v) whether Repossi's

success in the District Court would result in a judicial lien avoidable by the debtor; (vi)

the interests of judicial economy; and (vii) the impact of the stay on the parties and the

balance of harms.  Each of these factors weighs in favor of lifting the automatic stay:

(i)    Relief from the automatic stay would allow the District Court to resolve and
     liquidate Repossi's claims and the Debtor's counterclaims, either by
     summary judgment or trial of the issues.

(ii)   The litigation and the District Court's determination will not interfere with
     the Debtor's bankruptcy case, as the litigation will be limited to liquidation
     of claims and Repossi may not enforce any judgment it may obtain, pending
     further order of the Court.  Moreover, as discussed above, the "bankruptcy
     issues" relevant to the relationship between the Debtor and Repossi do not
     favor the Debtor or its general creditors, and there is likely to be little to

administer in the Chapter 11 case absent a determination of the District
Court litigation that is favorable to the Debtor.

(iii)    The District Court has the necessary expertise to hear the litigation,
especially with respect to Repossi's action for trademark infringement.  See
*McCrory Corp. v. 99 Cents Only Stores*, 160 B.R. 502, 506 (S.D.N.Y.
1993).  The District Court is familiar with the issues and has already issued
a preliminary injunction based on Repossi's claim of trademark
infringement.

(iv)    Pursuit of the litigation in District Court will not prejudice the Debtor's
other creditors because, as mentioned above, Repossi cannot enforce any
money judgment it may receive without permission from this Court and the
other issues in the case have been determined, on the record to date, in a
manner adverse to the Debtor.

(v)    The successful prosecution of claims against the Debtor will not result in an
avoidable judicial lien, as the litigation will be limited to the liquidation of
claims.

(vi)    Lifting the stay would promote the interests of judicial economy.  The
District Court has already heard the parties on Repossi's motion for a
preliminary injunction and granted a preliminary injunction.  It has also
given Repossi permission to move for summary judgment and contempt
sanctions.

(vii)    Lifting the stay will not result in undue hardship for the Debtor.  Although
the Debtor claims that pursuit of the litigation would interfere with its
efforts to reorganize and burden the estate with the additional costs, it does
not appear that the Debtor can reorganize if it is not successful before the
District Court.  Moreover, refusal to allow the pending litigation to proceed
in the District Court would prejudice Repossi and unnecessarily delay
administration of the estate, as the preliminary injunction prohibits the sale
of the jewelry.  Thus the balance of the harms favors granting Repossi's
motion to lift the automatic stay.

Based on the *Sonnax* factors, from a practical as well as a legal standpoint, the

automatic stay should be lifted to allow the litigation commenced in the District Court to

proceed.

**Conclusion**

For the reasons set forth above, Repossi's motion for relief from the automatic stay is granted but its motion to dismiss is denied.  The Debtor's motion to approve the sale of jewelry by private sales is denied.  Repossi should settle an appropriate order on five days' notice.

Dated:  New York, New York
      October 20, 2005

                        */s/ Allan L. Gropper*
                        **UNITED STATES BANKRUPTCY JUDGE**